## SIMMS OIL CO. v. COLQUITT.
### (No. 779–4770.)

Commission of Appeals of Texas, Section B.
June 22, 1927.

Mines and minerals ⬅️74 — Assignee of oil lease having option to pay rent, under assignment requiring additional payment out of oil marketed held not obligated to drill.

Where oil and gas lease requiring lessees to drill within eight months or pay annual rent of 50 cents per acre was assigned under assignment requiring a cash payment and an additional payment out of the first oil produced and marketed, *held* that both contracts must be construed together, and assignee had same rights as original lessees, and was not impliedly obligated to drill for oil, but had option to drill, pay annual rent, or forfeit lease.

Error to Court of Civil Appeals of Fifth Supreme Judicial District.

Action by O. B. Colquitt against the Simms Oil Company. Judgment for plaintiff was affirmed (289 S. W. 98), and defendant brings error. Reversed and rendered.

Thompson, Knight, Baker & Harris, of Dallas, for plaintiff in error.

Bailey & Bailey, of Dallas, for defendant in error.

POWELL, P. J. The Court of Civil Appeals admirably states the nature and result of this case, including the legal contentions therein involved. See 289 S. W. 98. We shall not restate the case here at any great length. A. L. Owens and wife executed an oil and gas lease to O. B. Colquitt and J. N. Graves, covering 160 acres of land in Young county. Later Colquitt and Graves partitioned the 160

acres, each taking two 40-acre tracts. Colquitt then assigned to Simms Oil Company each of his 40-acre tracts by separate assignments. The contract conveying his rights in what was called the northwest 40 acres contained the following provisions:

"Now, therefore, for and in consideration of seven thousand dollars ($7,000.00) cash in hand paid by Simms Oil Company, the receipt of which is hereby acknowledged, and seven thousand dollars ($7,000.00) to be paid out of one-half (½) of seven eighths (⅞) of the first net oil produced and marketed off of the hereinafter described premises, the undersigned, the present owner of the said lease and all rights thereunder or incident thereto, in so far as the tract hereinafter described is concerned, does hereby bargain, sell, transfer, assign, and convey all rights, title, and interest of the original lessee and present owner in and to said lease and the rights thereunder, in so far as it covers the so-called northwest quarter (N. W. ¼) of the J. A. Harkness survey above described, this so-called northwest quarter being a parallelogram, containing 40 acres of land, *more particularly described as follows:* [Here follows description of the 40 acres.] Together with all personal property pertaining thereto or used in connection therewith, to Simms Oil Company, and its successors and assigns."

It was the theory of both the lower courts that it was the implied duty of plaintiff in error, under the quoted assignment contract, unconditionally, and at all events, to drill the 40-acre tract in an effort to produce oil in order that the second $7,000 might be paid defendant in error; that, when the oil company failed, by June 1, 1922, a reasonable time, to do any drilling, it became liable as a matter of law, to pay Colquitt liquidated damages in the sum of $7,000. The case was tried before a jury, but, upon request from counsel for Colquitt, upon the conclusion of the testimony, the court instructed a verdict in favor of defendant in error for the said sum of $7,-000 with interest thereon from June 1, 1922, at 6 per cent. per annum. Verdict and judgment were entered accordingly by the trial court, and the Court of Civil Appeals affirmed the same.

Writ of error was granted by the Supreme Court on the "conflicts alleged." One of these conflicts will become apparent as we discuss the controlling question here presented.

Plaintiff in error submits this controlling assignment and propositions thereunder, as follows:

"First Assignment of Error.

"The honorable Court of Civil Appeals erred in its opinion and conclusion that the assignment from defendant in error to plaintiff in error of the leasehold estate involved in this suit created an implied obligation and duty upon plaintiff in error to drill for oil on the premises within a reasonable time.

"First Proposition.

"Plaintiff in error did not enter into an express obligation with defendant in error to drill on the 40-acre tract involved in this controversy. There was no implied obligation to drill at all, for the reason that such an implied obligation would be in conflict with the express terms of the original lease and of the assignment from defendant in error to plaintiff in error, in which defendant in error assigned to plaintiff in error the original lease and 'the rights thereunder,' including the right to defer drilling operations upon the consideration and conditions specified in the original lease.

"Second Proposition.

"Where the original lessee, as in the instant case, paid a valuable consideration not to be required unconditionally to drill, and thereafter sold and assigned the lease for a substantial cash payment and for a further payment to be made out of one-half of seven-eighths of the first net oil produced and marketed off of the premises, he sold the option not to be required to drill to an assignee, who, by accepting it assumed the identical obligations and benefits of the original lessee."

We think this assignment and the propositions thereunder must be sustained. As has been observed from the quoted assignment of the lease signed by Colquitt, he conveyed to the oil company all the rights which he himself had under the original lease from Owens and wife. It is important, therefore, in the first place, to see what are the material provisions of the lease in this connection. They are as follows:

"(1) It is agreed that this lease shall remain in force for the term of five years from this date, and as long thereafter as oil or gas or either of them is produced therefrom by the party of the second part.

"(2) The party of the second part (Colquitt) agrees to commence operations for drilling a well on said premises within 8 months from the date hereof, or pay rental at the rate of 50 cents per acre per year, while such commencement of operation for drilling a well is delayed. And it is agreed that the completion of such well shall be and operate as a full liquidation of all rent under this provision during the remainder of the term of this lease. A dry hole shall be deemed a completed well hereunder, and removal of casing or other improvements in such event shall not operate as an abandonment or forfeiture of any rights of second party under this lease."

"(3) All covenants and agreements herein set forth between the parties hereto shall extend to and are hereby made binding and obligatory upon their heirs, executors, administrators, successors and assigns."

It seems clear to us that the original lease and the subsequent assignment thereof are so essentially connected with each other that the two contracts must be considered and construed together. The only reasonable construction thereof, as evidencing the intention of the parties to the assignment, is that the oil company was to step into Colquitt's shoes and enjoy the same rights which the latter would have enjoyed had he retained the lease in question. In fact, the assignment itself ex-

pressly conveys these very rights to the oil company. One of the most valuable rights in this lease was the power to keep it alive for five years without the expense of any drilling, provided a small annual rental be paid. It is entirely unreasonable, it seems to us, to hold that the parties to this assignment intended that this valuable right should be nullified by a new implied obligation requiring drilling in order to pay Colquitt the conditional part of his consideration. If the parties had so intended, they could have easily provided for such drilling in just a few words. They did not do so.

The only logical implication of the assignment is that, if the oil company, in the exercise of its option under the lease, decided to drill a well and production should ensue, then the oil so produced was to be divided in the proportion stated between Colquitt and the oil company. No other construction of the lease and assignment is tenable. If the oil company preferred to surrender the lease rather than pay rentals or drill the land, it had the right to do so. And Colquitt himself assigned the oil company these very rights. Having done so, he cannot now vary these rights, expressly conferred, by an implied obligation to the contrary. This is well settled. No citation of authorities seems necessary.

Had Colquitt, as a consideration for the original lease, agreed to pay Owens and wife so much in cash and the balance out of oil to be produced on the lease, then it is perfectly clear that Colquitt himself could not have been required to pay the additional consideration by drilling the land, for the reason that the lease contained a provision authorizing him to defer drilling by the payment of annual rentals. This is also a well-settled principle of law. The Supreme Court of Oklahoma, in the case of Eastern Oil Co. v. Beatty, 71 Okl. 275, 177 P. 104, under such a state of facts, had this to say:

"It is sufficient to say that no covenant to develop the property can be implied in the face of an express stipulation for periodical payments for delay thereof not extending beyond a definite term. Although development on other lands in the vicinity may show the premises to be situated in oil and gas territory, and prove the adaptability of their land for successful and profitable mining operations, the lessors have no legal cause for complaint so long as they receive compensation for the delay for which they have contracted, and the operations on neighboring lands do not drain their premises. This court has never held, and, so far as we are aware, neither has any other court, that under such conditions a covenant for diligent operation, or operation at all, will be implied."

In the case of Smith v. Refining Corp., 12 F.(2d) 378, the Circuit Court of Appeals of the Eighth Circuit used this significant language:

"Oil and gas lease, reciting cash consideration and other considerations, and providing for pay-ment of additional amount out of the first oil produced and saved, but also providing that commencement of well might be deferred for successive periods of twelve months by paying specified rental, imposed no obligation on lessee to drill well or develop tract and no absolute obligation to pay the additional consideration."

It is equally well settled that this same principle of law applies to subsequent lessees under similar leases, unless there is an express obligation to the contrary in the assignment of such a lease. As to the effect of an assignment, such as we have here, of this kind of a lease, we shall refer to two leading authorities which sustain us. In the first place, we call attention to the case of Greenwood & Tyrrell v. Helm, 264 S. W. 221, by the Court of Civil Appeals at San Antonio, and in which case a writ of error was refused by our Supreme Court. In the Helm Case, the assignment from Helm, a lessee, to the Tyrrell firm, was essentially similar to the assignment of the lease in the instant case. The former assignment read as follows:

"The consideration of this conveyance of assignment is the payment of sixteen thousand ($16,000) dollars in cash by the said C. F. Greenwood and C. R. Tyrrell, receipt whereof is hereby acknowledged, and in addition thereto the payment of the sum of thirty-two hundred ($3,200) dollars to be paid out of the first oil produced from said lease over and above the royalty reserved to the original lessors; and in addition thereto the delivery to the grantor, his heirs, executors, administrators and assigns, free into tanks or pipe lines, one-sixteenth of all oil or gas produced or saved from said lease, or any part thereof, without any expense to the grantor, whatever."

The original lease in the Helm Case, with respect to drilling obligations, was also similar to the original lease in the case at bar. The lease in the former was described by the Court of Civil Appeals as follows:

"The tract of land over which this controversy arose, being 32 acres out of the W. C. Sartor pre-emption, in Eastland county, was owned by two cotenants. Each cotenant executed an oil and gas lease upon the land to Charles Pettit and another. These leases were not in the usual form of such instruments. They simply conveyed to the lessee the exclusive right to drill and operate for oil, gas, or other minerals in the land, and 'to make as many attempts, if and as lessee shall desire, to find oil or gas in paying quantities on, in, or under said premises,' 'provided,' in one of the instruments, 'lessees have begun operations in any such attempt within sixty days from this date,' and in the other, that 'lessee may begin operation in any such attempt at any time within four years from May 15, 1917.' The forfeiture clause in the lease is, 'and if such operations shall not be begun on or before the expiration of' sixty days in one case and by May 15, 1921, in the other, 'this lease shall wholly terminate; provided if prior to such termination said lessee shall have begun operations in an attempt to find oil or gas, then lessees shall have the right to continue such attempt with reasonable dili-

gence, as also to make as many additional attempts to find oil or gas in paying quantities as lessees please.'"

The effect of the Helm lease was summarized by the Court of Civil Appeals as follows:

"It may as well be said, at once, that in our opinion the original leases imposed no obligation whatever upon the lessees to exercise their option and drill the land. By express provisions the lessees were given the right merely 'to make as many attempts if and as lessee shall desire to find oil or gas in paying quantities, on, in, or under said premises.' In no event were they required to drill, and no penalty whatever was provided in the lease for failure to drill except a forfeiture of the right if not exercised within the time designated in the leases. This constituted a pure option on the part of the lessees, for which they paid a very substantial consideration in cash."

The court holds there was no express or implied obligation on the part of Tyrrell to do any drilling in order to pay Helm his consideration for the assignment.

In speaking of the implied obligation (the only kind contended for in the case at bar), the court, in the Helm Case, said:

"We do not think such a case is made here. The original lessee did not unconditionally obligate himself to drill; he paid a valuable consideration to be relieved of that very obligation, and for the privilege of himself determining from subsequent conditions whether to hazard further large sums of money in developing the land upon the chance of getting oil. It was this very option that appellee sold to appellants, who by accepting it assumed the identical obligations and acquired the identical benefits imposed upon or accruing to the original lessee, and passed on to them by appellee."

In the case of Matthews v. Ramsey-Lloyd Oil Co. et al., 121 Kan. 75, 245 P. 1064, decided about one year ago, the Supreme Court of Kansas had before it an exactly analogous case to the one at bar. In the Matthews Case the court, all seven justices concurring, held that the assignee was under no implied duty to pay the contingent consideration there involved. The court so completely answers similar contentions of defendant in error here that we quote from its opinion as follows:

"Just what was the nature of the contract between Matthews and the Ramsey-Lloyd Oil Company? Was it anything more than an ordinary transaction of bargain and sale, whereby the ownership of an oil and gas lease passed by assignment from assignor to assignee? The stipulated consideration was the substantial one of $12,000 in cash, together with the reserved condition that the assignor should receive a sum up to $30,000 out of whatever oil might be produced on the leased premises. There was no specific promise on the part of the Ramsey-Lloyd Oil Company that it was to drill for oil on the premises, and the circumstances of the sale and assignment were not fairly susceptible of an interpretation that plaintiff's assignee made any implied covenant to drill for oil. The

rights and duties of the holder of the lease were specifically defined by the lease itself. Preston, the original lessee, was not required to drill. He could avoid that expense and yet keep the lease alive by paying $1 per acre per annum. When plaintiff by assignment acquired Preston's interest in the lease, his rights and duties were the same as those of Preston. Plaintiff was not required to drill; he could keep the lease alive by paying $80 per annum. And this court can perceive no added or different obligation to prospect and develop for oil devolving upon the Ramsey-Lloyd Oil Company as owner of the lease than that which attached to its ownership when it belonged to Preston or when it belonged to plaintiff. There is a seeming lack of logic or of good conscience in the attitude of plaintiff. In effect, he says to his vendee: 'I sold you an oil lease which by its terms gave you the option to defer development on payment of $1 an acre per annum, but by your bargain with me in which you paid me $12,000 in cash and promised to give me $30,000 worth of oil out of the first production from that lease, the stipulation in the lease itself which permitted you as my successor in title to defer development didn't mean anything. That was a highly advantageous clause in the lease when I owned it; but it became a delusion and a snare when you acquired it.'

"Plaintiff presses upon our attention the rule of law that, where there is a contract to pay a consideration out of a particular fund, the obligor is under an implied duty to take the proper steps to cause such fund to be created. But here the main consideration was paid in cash, $12,000; and now, to hold that the assignee took the lease subject to an implied duty to drill and develop the property would render nugatory one of the most valuable privileges the assignee paid its money for—that of delaying development by the payment of an annual rental of $80.

"Since the lease which was the subject of sale and assignment between these litigants contained an express stipulation covering the matter of delay in development by payment of a stipulated annual rental, it would be particularly unjust to read into the contract of assignment an implied covenant that the new assignee of the lease took it under an obligation vastly more arduous than any under which it had been held by the original lessee or by the plaintiff in this action. This conclusion was reached by the Texas Court of Civil Appeals in the analogous case of Greenwood & Tyrrell v. Helm [Tex. Civ. App.] 264 S. W. 221, where one Pettit had obtained an oil and gas lease on 32 acres."

The court then proceeds to discuss the Helm Case at length.

We believe the Kansas case is unanswerable, and, since it follows the Helm Case from Texas, in which a writ of error was refused by our Supreme Court, as already stated, we feel that there is no necessity to further discuss this assignment of error and the propositions thereunder. The defendant in error himself sold to the oil company herein an option to drill, pay annual rentals, or forfeit the lease. It had the right to exercise its option as it pleased. If it saw fit not to produce oil, the defendant in error had no cause of action

for his part of the oil. Under the undisputed facts, no drilling had been commenced on the land when the suit was instituted.

It follows that there was but one proper judgment the trial court could have entered, and that was in favor of the plaintiff in error here.

In view of our conclusion aforesaid, it is unnecessary to pass upon other interesting questions presented in the application, and we do not do so.

For the reason indicated, we recommend that the judgments of the district court and Court of Civil Appeals be reversed, and judgment rendered by the Supreme Court in favor of the plaintiff in error.

CURETON, C. J. Judgments of the district court and Court of Civil Appeals both reversed, and judgment rendered for plaintiff in error, as recommended by the Commission of Appeals.